## FOLK v. COMMISSIONER OF INTERNAL REVENUE.

### No. 810.

Circuit Court of Appeals, Tenth Circuit.

Dec. 4, 1933.

Gentry Lee, of Tulsa, Okl. (Roscoe Harper, of Tulsa, Okl., on the brief), for petitioner.

Norman D. Keller, Sp. Asst. to Atty. Gen. (Pat Malloy, Asst. Atty. Gen., Sewall Key, Sp. Asst. to Atty. Gen., and E. Barrett Prettyman, Gen. Counsel, Bureau of Internal Revenue, of Washington, D. C., on the brief), for respondent.

Before LEWIS, PHILLIPS, and BRATTON, Circuit Judges.

LEWIS, Circuit Judge.

This is a petition for review of the action of the Board of Tax Appeals in its redetermination of petitioner's income taxes for the years 1922, 1923 and 1924. Revenue Act 1921 (42 Stat. 227) and Revenue Act 1924 (43 Stat. 253). Aside from petitioner's service in the Army he seems to have had no trade or business until after honorable discharge in 1920. He had no property in his own right as far as the record shows until in 1919. On the 24th of May of that year his wife died leaving him by devise and bequest an undivided two-thirds interest in 160 acres in Creek County, Oklahoma, and eight-fifteenths of the royalty interest reserved under an oil and gas lease, which she had given on the property in 1914. The royalty interest reserved under the lease was one-eighth of the mineral to be produced. There were producing wells at the time of her death. On account of litigation over his wife's title to the 160 acres the royalties were impounded. Her title was established in November, 1922. United States v. Atkins, 260 U. S. 220, 43 S. Ct. 78, 67 L. Ed. 224.

For a named consideration petitioner in December, 1922, assigned and transferred to Charles Page all his interest in the impounded royalties and those that would thereafter accrue up to January 15, 1923. In his return for 1922 he reported under oath that he had received that year in royalties $33,775.05. The commissioner accepted that item. When the matter came on for hearing before the board petitioner testified that he had received no royalties in 1922 and had no taxable income that year. The transaction between him and Page with reference to the royalties was fully developed and the facts found by the board. He received from Page corporate stock, later converted into negotiable securities, of a face value of $100,000 and a deed to a house and lot in Sand Springs, Oklahoma. Page acknowledged in writing in that transaction that he still owed petitioner $25,000, and there is no proof that he did not get it. The board in its opinion said of that transaction:

"In the year 1922 he (petitioner) received stock of the par value of $100,000 and a house in Sand Springs that was worth a substantial amount in exchange for his interest in the accrued royalties which he assigned to Page on December 30, 1922. The evidence fails to convince us that such property had a value less than the income reported by the petitioner for the taxable year."

We are unable to say that in this ruling the board erred in law. He also contended before the board that Page cheated him out of his share in the royalties as to which the board said there was no basis for that claim.

■ The other error of law urged here relates to deductible depletions for each of the three years, that is, whether there was any proof to sustain the board's finding of $100,000 as the basis of depletion. The commissioner in arriving at his asserted deficiencies used a valuation of $56,000, which was $2,000 more than the appraisal of the royalty interests for Oklahoma estate tax purposes. Petitioner's contention is based solely on the opinion testimony of an engineer, who had had experience in making such valuations. He found petitioner's interest in the oil reserves to be 130,-528 barrels and estimated their value at $229,-076.64 as of May 24, 1919. He never saw or examined this property, but worked in that oil field about two months prior to 1916. He estimated the oil under the ground from the history of these wells and his general knowledge of the field. He obtained his valuation by multiplying the number of barrels by three on the claim that oil in that field on May 24, 1919, had a value of $3.00 per barrel. He then reduced that sum to present worth on an estimated life of production of fourteen years, and deducted therefrom ten per cent for contingent hazards, thus arriving at $229,-076.64 as the value of petitioner's interest in the reserves as of May 24, 1919. He testified that the gross production of the property from about twenty wells for the first year (1915) was over one million barrels; that during the second year (1916) it declined to slightly over three hundred thousand barrels; and that its rapid decline continued throughout the years 1916, 1917 and 1918, due almost entirely to water intrusion. He testified that it was discovered in the early years of production that cement could be used to plug back the water, and that property adjacent to this was blocked back, the water shut off, and the production of oil thus increased. On the use of $3 per barrel for oil he testified that in May, 1919, the posted price for oil in that field was $2.25, that an additional 75 cents per barrel was then being paid as a premium. A schedule of prices from November, 1916, to November, 1921, was produced by him. It showed that on the first named date the posted price was a dollar per barrel, and there was a gradual rise to $2.25 in March, 1918. It continued to rise until March 1, 1920, when it reached $3.50, and it then declined to $1.00 in June, 1921.

The board in reaching its conclusion that petitioner's interest in the lease was worth $100,000 on May 24, 1919, gave some weight to the appraisal at $54,000 for state tax purposes. It said further that the factors used by the expert in arriving at a valuation were of doubtful weight and application; that the threat of destruction or great impairment of the wells by the intrusion of salt water was an element to be considered in fixing the valuation; that high prices for oil at particular dates should not be taken as a measure of value over a long term; and that the cement method of excluding salt water was only in an experimental stage in 1919. The board accepted the estimate of the witness as to amount of oil reserves on May 24, 1919, but declined to be guided solely by the opinion of the expert witness on the subject of their value.

■■ It is our opinion that the board's action on that subject finds support in the proof. "Whether there is substantial evidence to sustain the findings of fact is a question of law. If such substantial evidence exists, we are bound by those findings." Lucas v. Mercantile Trust Co. (C. C. A.) 43 F.(2d) 39, 41, and the cases there cited. The action of the board is affirmed.